David Nevin (ISB#2280)
Scott McKay (ISB#4309)
Nathan Pittman (ISB#9430)
NEVIN, BENJAMIN & McKAY LLP
303 West Bannock
P.O. Box 2772
Boise, Idaho 83701
Telephone: (208) 343-1000
Facsimile: (208) 345-8274

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 4:22-CR-0282-BLW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| BREK PILLING, | ) | **MEMORANDUM** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

1. <u>**Introduction**</u>.

Brek Aaron Pilling is before the Court for sentencing after pleading guilty to a misdemeanor charge of negligent endangerment, a violation of 42 U.S.C. §7413(c)(4). At sentencing Mr. Pilling will request that the Court follow the recommendation of the United States Probation Officer[1] and place him on probation without incarceration.

Mr. Pilling is 52 years of age and has lived in Burley since 2003. He is an industrious man of good character, motivated by deep religious belief, a love of family, and respect for others. He has no record of criminal convictions and has never consumed alcohol or illegal

---

[1] *See,* Sentencing Recommendation, Document 99, July 30, 2024, p. 1.

drugs.  He has an exemplary academic record, including a Ph.D. in clinical psychology.  He honorably served his country in the United States Air Force.  He is a beloved father and provider for 8 children, who themselves have substantial records of success.  Mr. Pilling is a successful businessman, and over the years has started, acquired, and operated businesses that today employ, directly or indirectly, some 45 employees.  And he has a striking record of generosity and community service, most of it not public, and a commitment to helping people who have been less fortunate.  One letter writer summed it all up quite simply: "he is a good man."[2]

The offense that brings Mr. Pilling before the Court is a negligence misdemeanor.  Pursuant to a plea agreement, Mr. Pilling timely tendered his guilty plea, and fully accepts responsibility for the offense.  He is committed to arriving at a settlement of his responsibility for the cleanup costs in a separate CERCLA action.

We argue below that the Probation Officer incorrectly applied certain features of the sentencing guidelines in calculating the sentencing level, and propose an alternate calculation.  In any event, there are ample grounds for departure to Zone A.  Finally, The Probation Officer found that certain factors under 18 U.S.C. §3553(a) are present in this case, and recommended probation without incarceration.  We respectfully request that the Court follow this recommendation.

**2.  Mr. Pilling's personal and family history.**

After graduation from high school in 1989, Mr. Pilling enrolled at Brigham Young University, and, with the exception of a two-year mission in Japan, studied continuously in Provo until 1999, receiving his Ph.D. in 2000 after an internship.  Mr. Pilling was then commissioned into the United States Air Force where he served as a psychologist for four years

---

[2] Various letters in support of Mr. Pilling are at Document 100-1, July 31, 2024 (filed under seal).  *See* Document 100-1, p.3.

in Ohio and South Dakota.  He was honorably discharged in 2003 with a diagnosis relating to knee and ankle injuries, and an endocrine disorder.

After returning from his mission, Mr. Pilling met Emily Burtenshaw at BYU, where she was pursuing a degree in music and violin performance.  Eight months later the couple was married, and Emily soon withdrew from university to be a mom.  The Pillings have 8 children, ranging in ages from 12 to 28.  *See* Exhibit A (family photos).  Five have graduated from high school and 3 remain in the public schools in Burley.  Five of the children have attended or will attend college.  Three of the children have served missions.  Mr. Pilling also has 3 grandchildren who live in Burley.  Mr. and Mrs. Pilling were divorced in 2020, but they remain close, committed to raising their children and keeping the family intact.  They continue to occupy the family home together, and are engaged in couples therapy, making progress toward remarriage.

Mr. Pilling's parents live in the Burley area and are active participants in Pilling family life.  Mr. Pilling has 5 siblings (one brother has passed away): a brother in Twin Falls is a podiatrist; 2 brothers in Boise are dentists; and a brother (graphic designer) and sister (IT professional) live in northern Utah.

After the Air Force, the Pillings moved to Burley and Mr. Pilling took a job with Kodiak Northwest, a manufacturer of high-capacity snow removal machines.  Three years later, in 2006, Mr. Pilling bought the company outright.  Mr. Pilling is and always has been diligent and frugal.  From a paper route at age 8 to working as a landscaper in junior high and high school, he worked hard and saved every penny.  He was able to pay his own tuition at BYU.  He built a house (with his own hands) in Utah while in school – and sold it at a profit.  As he put it, "I didn't buy nice cars, nice clothes or electronics – I bought an education and real estate."  When excess funds were available, he successfully invested them.  Over the years Mr. Pilling has started or acquired,

and operated, a variety of other businesses, as noted at paragraphs 53-54 of the Presentence

Investigation Report (PSIR).

Mr. Pilling has particular concern for employees who depend on him for their jobs and

livelihood.  In a letter to the Court, Mr. Pilling's son Scott describes his father passing up a

lucrative opportunity to sell one of his businesses to a Chinese purchaser because the purchasers

could not guarantee that the business's employees would keep their jobs.  Lance Jensen writes, "I

don't know all Brek's business dealings but am aware of enough of them that he provides

employment for dozens of people who rely on his management and ownership for their

livelihood."  By Mr. Pilling's estimate, some 45 employees would lose their jobs if he were

incarcerated and unable to continue to manage his businesses.[3]

Not only employees have benefited from Mr. Pilling's business success.  Business

assistance provided by Mr. Pilling to Archie Yamada "gave me an opportunity to get back on my

feet by joining him in housing a development project [sic].  Without Brek, I am not sure where I

would be. This is a life altering gesture to me, however, I am only one of many many families

that Brek has done this for."  Brian and Debra Barlow describe Mr. Pilling loaning them money

to keep their business afloat in a difficult time, and, when they were back on their feet, declining

repayment, and "has never mentioned it again in all the years of our friendship!"

Mr. Pilling has held a variety of leadership positions in his church, including as a bishop

(in South Dakota), Elders Quorum president, and Young Men's president.  He has served as a

Gospel Doctrine teacher and a Sunday school teacher.  After taking up the piano as an adult Mr.

Pilling now plays organ and piano in church.  He has also coached youth sports teams for all of

---

[3] Some 30 employees work directly for Mr. Pilling's businesses, and another 15 work for independent contractors who depend on work from Mr. Pilling, and would be at serious risk of losing their jobs if his work stopped.

DEFENDANT'S SENTENCING MEMORANDUM - 4

his eight children.  One of the girl's teams he coached, on which his daughter Sydney played, went on to win the Girls' 4A high school championship in 2018.  Exhibit A, p.15.

The letters of support reveal a man who has answered a calling to help those less fortunate.  Mr. Pilling's mother-in-law Darla Burtenshaw writes:

> He seems to focus his greatest efforts and generosity towards anyone on the margins. Anyone who is a little bit on the outside of things. The underdogs. I've seen him do this over and over and over again. The friends of his own children who are experiencing struggles at home have a place to stay, food to eat, a job at one of Brek's businesses or around the house, and acceptance.

When Paige Darrington's husband deserted her, Mr. Pilling "counseled my kids, coached my daughter in basketball, let my son drive his sportscar to the prom, helped us move, helped me landscape my new yard, and helped me start a business, just to name a few things."  Mr. Pilling's mother, Janice Pilling, points out that Mr. Pilling "has helped and continues to help parent the children of his deceased younger brother."  And she mentions a particularly poignant case: "A young man at Burley High School committed suicide. Brek didn't know the family but knew the need; a mother grieving with a surviving son and no husband."  Substantial assistance followed. Darla Burtenshaw describes Mr. Pilling paying for airline tickets for friends so that they could travel to China to pick up children they had adopted.  Kevin Mallory describes asking Mr. Pilling if he had a dump truck he could loan "after a wind storm blew the roof off my shop in Burley. He said he did, and then asked if I needed help, and in the same breath said of course you do and spent a Saturday roofing my shop and brought his son Luke to help."  Paige Darrington describes Mr. Pilling spontaneously offering at a city council meeting to repair an unknown man's windshield who complained that it had been damaged by a golf ball near the city golf course.

Ms. Darrington continues that Mr. Pilling "taught me the joy of helping others anonymously," and describes their quietly arranging to have a well drilled for a woman who had

DEFENDANT'S SENTENCING MEMORANDUM - 5

recently lost her husband.  Emily Pilling says that "[o]ften times he doesn't even tell me what he has done. I sometimes learn of things, not from him, but from those he helps."  She describes a man she had never met, "a bit rough around the edges," stopping by the house unannounced shortly before Christmas with a gift for Mr. Pilling as thanks for help he had provided.

> The letter from Mr. Pilling's younger brother Jordan Kent Pilling echoes these themes:

> He has literally taken on mortgages for people about to lose their home. He teaches boys with no fathers to become responsible men.  He helps widows who are left alone and need a helping hand.  People who know of his professional successes will ask him for help in reorganizing their business/retirement/etc., and he is always willing to share his experiences and knowledge just because he loves to help. He has done all of this countless times out of the charity of his own heart, the money out of his own pocket and out of the responsibility he feels to help others in need in any way possible.

Mr. Pilling has also instilled the habit of service in his children.  Scott Pilling says,

> Several times a month, my dad would wake me and my brother up as early as 5 a.m. [t]o perform some sort of church service project. This would include weeding some elderly person's garden, setting up flags on a holiday, cleaning the church, or something else of similar nature. I spent more time serving somebody, whether church related or non-church related, than I did playing with friends most of the time. In all honestly, it was quite annoying, but I'm glad I was taught to serve. My understanding of the importance of service with no expectation of something in return stems directly from Brek.

Scott goes on to describe being "on vacation as a family in Phoenix three weeks ago and the first day on vacation, Brek took my younger brothers and went to help frame a portion of a building for somebody he knew in the area who needed help." His daughter Sydney writes, "I swear growing up, regardless of the fact that we had 8 kids in our family already, my parents were always letting my siblings [sic] friends live with us who had hard lives at home or who's [sic] families moved far away."

> Paige Darrington states that Mr. Pilling "taught me that our resources and talents are a stewardship from God. He said if we always help others, we will be successful."  Archie Yamada

DEFENDANT'S SENTENCING MEMORANDUM - 6

feels that three words describe Mr. Pilling's character: integrity, humility and selflessness.  Paige Darrington says

> [f]rom my association with Brek Pilling, I can tell you that he is a giver, a builder, a lifter, and a contributor. He is the kind of man that you want your sons to emulate. He has strong moral principles, and he is guided by them. He is devoted to his family, and he lives what he believes. He is honest and upright, loyal and kind. He is a friend to all. Our community and our world need more men like him.

And Cheryl Berg, a retired high school English teacher with substantial community involvement of her own, says, "I used to be a force to be reckoned with as a demanding teacher," but these days she is "often less noticed because of continuing ill health."  Nonetheless, "Brek continues to make me feel valued and significant. There are few people who have been as kind to me over the years. He is a good man."

**3.  <u>Offense conduct</u>.**

a.  In October 2017, Diconia, LLC, an entity owned by Mr.  Brian Tibbets, Mr. Pilling's then-business partner in a separate venture, purchased two derelict buildings located at 1222 and 1226 Overland Avenue in downtown Burley, Idaho.  On January 29, 2018, the buildings were badly damaged and rendered unsafe by a fire and efforts to extinguish it.  The City of Burley pressed Mr. Tibbets to promptly address the situation.

However, Mr. Tibbets was unavailable, and because of Mr. Pilling's construction experience, Mr. Tibbets asked Mr. Pilling for his assistance.  At Mr. Tibbets's request, Mr. Pilling met with several potential demolition contractors (none of whom Mr. Tibbets could afford to hire), during which asbestos was mentioned.  When Mr. Pilling advised Mr. Tibbets of this, Mr. Tibbets assured him that he had sampled the debris and sent it to a lab for testing, but that the sample package broke open during shipment; and that a second sample was taken which returned negative results.  Mr. Pilling was negligent in accepting this representation.  Mr. Pilling

provided this information to others, including the EPA.  As Mr. Pilling's phone records confirm, throughout his involvement, each of his calls with contractors or the EPA was followed by one or more calls with Mr. Tibbets – because it was Mr. Tibbets's project and he was the decision-maker.

Mr. Tibbets ultimately hired a contractor to conduct a limited cleanup of the buildings to make them safe until he could afford a full demolition.  The cleanup began on February 17, 2018, but it soon became clear that the building walls were unstable and needed to be fully leveled on an emergency basis.  Demolition and transportation of debris halted following concerns about the presence of asbestos in the buildings, confirmed by subsequent EPA testing. Mr. Tibbets was unable to arrange or pay for a cleanup of the demolition site, and on August 18, 2018, the EPA mobilized an emergency cleanup response that ultimately removed demolition debris and remediated the site.  The EPA reports that its costs associated with the cleanup of the demolition site were $844,833.90.

b.  Paragraph 6 of the PSIR states that its description of the Offense Conduct is "derived from investigative material provided by" the government.  As we argued in more detail in our Objections to the Initial PSIR,[4] these materials primarily relate to the charges in the original seven-count Indictment charging Mr. Pilling with being the owner or operator of a demolition operation that failed to handle asbestos correctly, and are not relevant to the pending negligent endangerment charge.[5]  Moreover, the charges and factual basis of the original Indictment were and are disputed,[6]

---

[4] Defendant's Response and Objections To Initial Presentence Investigation Report (Filed Under Seal), July 17, 2024 (Document 95) (hereafter Objections), p.2.

[5] For example, the details of the Clean Air Act asbestos work practice standards and what constitutes an "owner or operator of a demolition activity," set out in Paragraph 7 of the PSIR, are not relevant to the negligent endangerment offense to which Mr. Pilling pled guilty.

[6] Mr. Pilling does not suggest that the Probation Officer has inaccurately set out the allegations in the government investigative materials, but rather disputes various content of the materials themselves.

and in view of the disposition of this case, have not been litigated – at the very least their truth value is sufficiently lacking that they could not be satisfactorily established as relevant conduct.[7] Nor is it practical, necessary, or appropriate at this point to conduct a mini-trial for this purpose.

c. Mr. Pilling objects to the statement in Paragraph 8 of the PSIR that he and Mr. Tibbets "intended to tear the buildings down and erect a parking lot that would serve their restaurant." Actually, the building purchase was conceived of by Mr. Tibbets as part of a scheme to extinguish his substantial indebtedness to his and Mr. Pilling's joint business. Mr. Pilling heard him out and viewed the buildings, but concluded that the idea was speculative and very unlikely to succeed, and said so. He understood Mr. Tibbets had abandoned the idea. Later he learned that Mr. Tibbets had purchased the buildings using company funds and made various statements to persons (including to the ATF) based on this understanding. It was not until later that Mr. Pilling learned that Mr. Tibbets actually purchased the buildings through his separate business entity, Diconia, LLC, and that Mr. Pilling was not in fact an owner of the buildings.

d. Mr. Pilling objects to the statement in Paragraph 11 of the PSIR that he "and Brian Tibbets subsequently hired the company Curb A Peal to conduct the demolition. Evan Carnahan and the defendant co-owned … Curb A Peal." As we pointed out previously,[8] Mr. Tibbets, not Mr. Pilling, hired Curb A Peal to conduct a partial cleanup of the buildings.[9] Unable to afford a complete demolition, Mr. Tibbets gave the contractor the go-ahead to secure the site, make the buildings safe, and remove debris from sidewalks and adjoining properties. Without notice to Mr.

---

[7] Sentencing-related facts must be proved by a preponderance of the evidence unless they have a "disproportionate impact" on the sentence, in which case they "must be established by clear and convincing evidence." *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir.1999); *United States v. Lawton*, 193 F.3d 1087, 1095 (9th Cir. 1999).

[8] Objections, pp. 5-6.

[9] Witnesses report the contractor inquiring of Mr. Pilling whether he could go forward with demolition of the buildings, and Mr. Pilling telling him that he would need to discuss that with Mr. Tibbets, because it was not his (Mr. Pilling's) project or responsibility.

Pilling, the cleanup began on Saturday, February 17, 2018 while Mr. Pilling was in Boise watching his daughter play in the state high school basketball championships.  Exhibit A, p.15.  Mr. Pilling learned for the first time that work had commenced when the contractor contacted him that afternoon for assistance in reaching Mr. Tibbets, apparently to report that because the walls of the buildings had become unstable, the partial demolition plan was no longer feasible.  The contractor needed Mr. Tibbets's approval to take the buildings all the way to the ground on an emergency basis, instead of just performing the limited cleanup originally envisioned.

The assertion that Mr. Pilling was a co-owner of Curb A Peal was a component of the government's broader argument that Mr. Pilling was an owner or operator of the demolition operation, as charged in the Indictment the government has now agreed to dismiss, and is not relevant to the charge of negligent endangerment.  Mr. Pilling was not actually a co-owner of Curb A Peal, as the tax returns Mr. Pilling was prepared to place into evidence at trial would have shown.  Mr. Pilling has never received income from Curb A Peal for a simple reason –he is not now, and was not in 2018, an owner of Curb A Peal.

e. Mr. Pilling objects to the description of the quantity of asbestos-containing material in Paragraph 12 of the PSIR.  We previously addressed a similar argument[10] which will not be repeated here.  In short, the government's estimation of the amount of asbestos present in the facility would have been challenged at trial in part because it used dubious calculation methods to reach the regulatory thresholds.  Most notably, as to the roofing material, the amounts claimed by the government were arrived at by a process of gross estimation in which an EPA employee eyeballed "piles" of debris and made a thumbnail estimate of their volume and asbestos content.

f. Mr. Pilling also objects to the language in paragraph 13 of the PSIR that "EPA disposed

---

[10] Objections, pp. 7-8.

of 149.2 tons of asbestos-contaminated waste from the site." As we argued previously,[11] 149.2 tons was the gross amount of the entirety of the demolition rubble. The amount of this waste actually contaminated by asbestos is unknown, as the EPA contractor arbitrarily classified all demolition waste (with the exception of recyclable metal that could be removed from the debris) as "asbestos-contaminated," yet only 17 of the 62 bulk samples taken from the demolition site were found to contain regulated amounts of asbestos.

**4. Sentencing Argument.**

    **a. The Sentencing Guidelines post-*Booker*.**

This Court has summarized the post-*Booker* sentencing landscape succinctly:

> In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are just "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 105 (2007). While the Guidelines must serve as the "starting point and the initial benchmark" of this inquiry, the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The court's central task must be to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

*E.g., United States v. Gneiting,* 4:22-CR-00167-BLW, 2024 WL 2978638, at *1-2 (D. Idaho, June 13, 2024).[12] As the Ninth Circuit puts it,

> "One theme" runs through the Supreme Court's recent sentencing decisions: "[*United States v.*] *Booker*[, 543 U.S. 220 (2005),] empowered district courts, not appellate courts .... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing...." *United States v. Vonner,* 516 F.3d 382, 392 (6th Cir.2008) (en banc) (Sutton, J.).

*United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (internal citations omitted)

---

[11] Objections, p.8.
[12] Identical language appears in some 75 cases reported on Westlaw, beginning, apparently, with *United States v. Jennings,* 4:16-CR-00048-BLW, 2017 WL 2609038, at *1-2 (D. Idaho June 15, 2017).

(sentence of probation affirmed on appeal where Guidelines called for a 41-51 month sentence because "the district court was 'in a superior position' to find the relevant facts and to 'judge their import.'")

Among other matters, the factors enumerated in USSG § 5H, previously placed outside consideration in all but the most unusual cases, are now appropriate for supporting departure or variance.  *E.g., United States v. Ranum*, 353 F.Supp.2d 984, 985-86 (E.D. Wis. 2005). Following *Booker*, courts must once again consider these factors along with the guidelines and their policy. To be clear, extraordinary circumstances are *not* needed to justify a sentence outside the guideline range. *See, id; United States. v. Ruff*, 535 F.3d 999 (9th Cir. 2008).

In practice this landscape mandates

a three-step procedure that district courts must follow in determining the proper sentence: (1) calculate the appropriate Guidelines range, including the offense level and criminal history category of the defendant; (2) consider any applicable departures under § 5H or § 5K of the Guidelines; and (3) consider the factors enumerated in 18 U.S.C. § 3553(a).

*United States v. Rosales-Gonzales*, 801 F.3d 1177, 1180 (9th Cir. 2015).  More particularly, after the guidelines range is determined and any departures applied, "[t]he district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties …." *United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008).

**b. <u>Calculation of Guidelines range and conditional motion for departure</u>.**

The Statutory Index makes USSG § 2Q1.2 applicable to this case.  The Court should calculate the Guideline levels applicable to this case as follows:

- 2Q1.2(a) Base Offense Level, **<u>8</u>**
  - 2Q1.2 (b)(1)(B) offense involved a discharge, release or emission of a hazardous or toxic substance, **<u>+4</u>**
  - 3E1.1(a) and (b) Acceptance of Responsibility, **<u>-3</u>**
  - 4C1.1(a) and (b) Adjustment for zero-point offender, **<u>-2</u>**
  - Total Offense Level **<u>7</u>** (0-6 months) (Zone A).

1) __The PSIR incorrectly applied three Specific Offense Characteristics__.

The PSIR applies three Specific Offense Characteristics (SOC) in its guideline calculation. Mr. Pilling provided detailed objections to these SOCs in his objections to the initial PSIR and in his Reply to the government's Response to those objections, which will not be repeated in full here.

As to SOC § 2Q1.2(b)(2) (9 level increase where offense resulted in a substantial likelihood of serious bodily injury) (PSIR paragraph 26), the initial PSIR did not apply this SOC and the parties only addressed it after the government raised the issue in its Response to Mr. Pilling's objections.  In his Reply[13] Mr. Pilling pointed out that Application Note 6 to § 2Q1.2 provides that this SOC only "applies to offenses where the public health is seriously endangered …," and that the government has not demonstrated by clear and convincing evidence that there is such a "substantial likelihood of serious bodily injury" here.  Indeed, the reported cases that applied this SOC all involve much more extensive, and much better documented, asbestos exposure than in the present case.

The PSIR accepted the government's argument that Mr. Pilling's guilty plea to misdemeanor negligent endangerment in itself requires application of this SOC.[14]  But negligently placing another in *imminent danger* of serious bodily injury (as the Information alleges) is very different from creating a *substantial likelihood* of injury.  Driving from Boise to Pocatello may place a person in "imminent danger" of injury that is only a small error of judgment or lapse of attention away.  But no one would take that drive if there were a "substantial likelihood" of serious bodily injury along the way.

As to SOC § 2Q1.2(b)(3) (4-level increase if "offense resulted in disruption of public

---

[13] Defendant's Reply To Government Response To Objections To Initial Presentence Investigation Report (Filed Under Seal), July 25, 2024 (Document 97) (hereafter Reply), pp. 6-11.
[14] Addendum to Presentence Report, Document 98-1 (hereafter Addendum) paragraphs 2-3.

utilities or evacuation of a community, or if cleanup required a substantial expenditure,") (PSIR

paragraph 27), the PSIR incorrectly finds that the raw amount of the cleanup cost is determinative.

In our Objections to the initial PSIR, and in our reply to the government's response to those

objections,[15] we relied on *United States v. Merino*, 190 F.3d 956, 958–59 (9th Cir. 1999), in which

the Ninth Circuit rejected determining whether an expense is "substantial" solely by reference to its

raw amount.  Reasoning that "[a] word in a statute ought to be read in the context of the purpose it

serves," 190 F.3d at 958, the Court held that "[f]or an expenditure to be 'substantial' in this context,

it ought to be of the same order of magnitude in its impact on the community," *id.,* as one which

resulted in such widespread harm as disruption of utilities or evacuation of a community.[16]  No such

widespread harm occurred here.  By treating the raw amount of the cleanup expenditure as

controlling, the PSIR[17] uses the very approach *Merino* rejected.[18]

        We also pointed out that the government provided in discovery an offer by a certified Idaho

Falls asbestos abatement firm to remediate the site for a fraction of what the EPA's Seattle

contractor ultimately charged, raising the question whether those expenditures were "required."

        As to SOC § 2Q1.2(b)(1)(A) (6-level increase for ongoing, continuous or repetitive

discharge) (PSIR paragraph 25), Mr. Pilling argued[19] for the 4-level increase pursuant to

§ 2Q1.2(b)(1)(B), because the discharge in this case occurred in a brief period.  The failure of Mr.

Tibbets to stabilize the site in the summer of 2018 is not fairly attributable to Mr. Pilling, who by

---

[15] Objections, pp. 13-15; Reply, pp. 4-6.
[16] As the Court put it in *United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020), *Merino* stands for the proposition that "substantiality depends on context."
[17] Addendum, paragraphs 13-14.
[18] In the related case of *United States v. Brian Tibbets*, the government entered a plea agreement with Mr. Tibbets in which it agreed that "[t]he 4-level increase under USSG § 2Q1.2(b)(3) does not apply."  The government provided a copy of the Plea Agreement to counsel for Mr. Pilling in discovery.  As noted elsewhere in sentencing submissions, the government has since withdrawn from this agreement because Mr. Tibbets violated its terms.
[19] Reply, pp. 11-12.

DEFENDANT'S SENTENCING MEMORANDUM - 14

March had withdrawn from his efforts to assist Mr. Tibbets, as EPA recognized.

With respect to paragraph 21 of the PSIR, Mr. Pilling proposed a misdemeanor resolution of the case in the spring of 2023 and did not withdraw the proposal throughout the pendency of the case.  Thus, it was the government's decision to withhold the misdemeanor resolution until the eve of trial, not any reluctance on Mr. Pilling's part, "which caused the court and government to allocate unnecessary resources to trial preparation."  We respectfully request that Mr. Pilling be granted the additional 1-level reduction pursuant to USSG § 3E1.1(b), to which the government does not object.

**2) <u>Departure</u>.**

If the Court adopts Mr. Pilling's calculation of the Guidelines range, a sentence of probation is expressly warranted without departure because Level 7 is in Zone A.  To the extent the Court arrives at a Total Offense Level that requires a departure to impose a sentence of probation, Mr. Pilling respectfully moves the Court to exercise its discretion and depart downward from the advisory sentencing guidelines.

As noted above, Application Notes 4, 6, and 7 to § 2Q1.2 provide grounds for departure in that Mr. Pilling is charged with negligent (as opposed to knowing) action (Application Note 4); the present case, by comparison to others, is not one where "the public health [was] seriously endangered" (Application Note 6); and the "nature of the contamination" suggests a downward departure (Application Note 7).  Also, Paragraph 82 of the PSIR provides that "the guidelines have not taken into consideration the personal history and characteristics of this defendant.

The following grounds for departure are present in this case.

§ <u>5H1.11</u>.  Military, Civic, Charitable or Public Service; Employment-Related Contributions; Record of Prior Good Works.

Among "the personal history and characteristics of this defendant" that "the guidelines have

not taken into account" are his military service and his extraordinary record of community service and good works.  The letters of support reveal a consistent and longstanding pattern of helping those in need, sometimes anonymously, and always out of a conviction that service should be provided by those who have been blessed with good fortune.  Cases recognize similar good works as a ground for departure.[20]

§ 5K2.20.  Aberrant behavior.

The Court should find that Mr. Pilling's offense represents aberrant behavior because it was 1) committed without significant planning, 2) was of limited duration, and 3) represents a marked deviation … from an otherwise law-abiding life, 5K2.20(b).  Furthermore, none of the disqualifying prohibitions enumerated at 5K2.20(c) are present.  Mr. Pilling has lived an exemplary, law-abiding life.  And we were prepared to prove at trial that when Mr. Pilling encountered a potential problem with asbestos during construction of his restaurant, he undertook considerable expense to deal with the problem correctly.  The present offense behavior is truly aberrant for Mr. Pilling.

§§ 5H1.2, 5H1.5 Education and Vocational Skills and Employment Record.

Mr. Pilling has striking educational accomplishments, vocational skills, and employment record.  As noted above, Mr. Pilling obtained a PhD in clinical psychology while paying his own tuition at BYU; has worked continuously since a very young age, while carefully "saving every penny," and as a result has successfully started, acquired, and operated a variety of businesses that provide jobs for some 45 persons.  *See Gall v. United States*, 552 U.S. 38, 42, 54 (2007).

---

[20] *See, e.g.*, *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming four-level departure to probation in securities fraud and tax evasion case based on defendant's good work where defendant did not simply donate money to charity but organized and ran youth football team in depressed area and helped members attend better schools and go to college); *United States v. Warner*, 792 F.3d 847 (7th Cir. 2014) (affirming probationary sentence where tax evasion Guidelines were forty-six to fifty-seven  months due to defendant's exceptional acts of charity and demonstrated concern for the welfare of others).

DEFENDANT'S SENTENCING MEMORANDUM - 16

<u>5 H1.3</u> (Mental and Emotional Conditions).

Paragraph 47 of the PSIR describes Mr. Pilling's Mental and Emotional Health, including his suffering from PTSD.  In addition, he and his ex-wife are engaged in counseling aimed at restoring their marriage.  The probation officer recommends as a condition of probation that "[t]he defendant shall participate in a program of mental health treatment, as directed by the probation officer.  The cost to be paid by both the defendant and the government based upon the defendant's ability to pay."[21]  This treatment can be most efficiently provided at Mr. Pilling's expense, as a condition of probation.

Mr. Pilling respectfully suggests: that the mitigating circumstances set out above are "of a kind or to a degree, not adequately taken into consideration by the" Guidelines, § 5K2.0(a)(1)(A), (2), (3), and (4); that the Court should also consider these circumstances cumulatively under 5K2.0(c); and that a sentence in Zone A or B of the Sentencing Table is entirely appropriate.

**c.  <u>Application of 18 U.S.C. § 3553.</u>**

18 U.S.C. § 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this section." Paragraph (2) refers to four considerations, namely "the need for the sentence imposed

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

---

[21]  Sentencing Recommendation, p. 3.

18 U.S.C. § 3553(a)(2).  In assessing the propriety of a particular sentence to satisfy these needs, section § 3553(a) directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the kinds of sentences available (§ 3553(a)(3)); the provisions of the sentencing guidelines (§ 3553(a)(4) and (5)); the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553(a)(6)); and the need to provide restitution to any victims of the offense (§ 3553(a)(7)).

As to the kinds of sentences available, § 3553(a)(3), Mr. Pilling's guilty plea to negligent endangerment, a Class A misdemeanor (18 U.S.C. § 3559(a)(6)), qualifies him for a sentence of probation.  18 USC § 3561(a) (only a "Class A or Class B felony" is ineligible for probation). And as we show above, a probationary sentence would satisfy the requirements of the Sentencing Guidelines, § 3553(a)(4) and (5).  As to the need to provide restitution, § 3553(a)(7), as the PSIR at paragraph 80 indicates, the parties have agreed that whatever resolution is reached in the separate CERCLA action should serve as restitution in the present case.  A custodial sentence will only tend to diminish and delay Mr. Pilling's capacity to make restitution.

1) **Nature and circumstances of the offense, (§ 3553(a)(1)).**

A sentence of probation will appropriately reflect the seriousness of the offense, respect for the law, and just punishment (§ 3553(a)(2)(A)).  Mr. Pilling has pled guilty to a non-violent misdemeanor alleging negligence.  The Probation Officer has recommended probation without incarceration.  The offense resulted in a relatively brief and limited exposure of asbestos to the ambient air, and the specific quantum of exposure has not been determined scientifically.  No one is shown to have fallen ill, or to be likely to.  Two of the three sources of asbestos-containing materials in the Overland buildings were not disturbed at all (pipe insulation) or very little

(spray-on texture) during the partial demolition.  As to the roofing material, the quantity of material is a matter of estimation and there is no way to know how much of it actually became airborne during the partial demolition.

By placing Mr. Pilling on probation, the Court would not create unwarranted sentencing disparities with other defendants (§ 3553(a)(6)).  Very few reported cases have involved convictions under 42 U.S.C. § 7413(c)(4) – none in the Ninth Circuit, and only a handful in other circuits – and all involve much more serious offense behavior than is at issue in this case.[22]  Mr. Pilling's case simply does not involve such an extensive exposure, or such egregious behavior on the part of the defendant.

Congress has specifically articulated its view of "the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . .." 28 U.S.C. § 994(j) (emphasis added).  Moreover, while it is of course true that "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007): *United States v. Lehmann*, 513 F.3d 805,

---

[22] *See, e.g., United States v. Hylton,* 308 Fed. Appx. 262, 263-64 (10th Cir. 2009), (inmate laborers required to "remove a large quantity of insulation related to the depot's boiler system," later determined to contain asbestos.)  A "board certified toxicologist, testified that the 'tremendous intensity' of the asbestos to which the inmates were exposed 'over a very short time ... likely overwhelmed their bodies' natural ability to remove these fibers,'" leading to a heightened risk of developing "serious debilitating and potentially lethal asbestos-related disease[s]." *Id.*  Mr. Hylton was sentenced to a six-month term of imprisonment in large measure because the District Court concluded he had lied under oath at the trial. *Id.*  Several § 7413(c)(4) cases have involved corporate defendants, and significantly greater harms than in this case.  *See United States v. E.I. Du Pont De Nemours & Co.*, 622 F. Supp. 3d 460, 476 (S.D. Tex. 2022) (4 workers killed when "approximately 24,000 pounds of MeSH gas escaped into the air through open drain valves on the third floor MeSH Vent Header, injuring more DuPont workers inside and outside the IBU manufacturing building and traveling downwind into the city of Deer Park, Texas, and beyond"); *United States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750, 751 (5th Cir. 2012) (corporate defendant mislabeled a container as a result of which an employee was killed due to exposure to "highly toxic industrial waste.").

DEFENDANT'S SENTENCING MEMORANDUM - 19

808–09 (8th Cir. 2008); *United States v. Ruff*, 535 F.3d 999, 1003–04 (9th Cir. 2008).

    **2) History and characteristics of the defendant (§ 3553(a)(1).**

    Mr. Pilling is a first offender who has lived a law-abiding productive life, successfully completed a rigorous course of education, acquired, started, and operated successful businesses that provide gainful employment for dozens of employees in the community, established and maintained a loving and accomplished family, and provided real service to his community.  At arraignment on the more serious felony charges which are to be dismissed, Mr. Pilling was released without bail or supervision, violated none of the conditions of his release, and will appear as ordered for sentencing.

    The Probation Officer notes (PSIR at paragraph 82) that "[t]he following 18 § 3553(a) factors are present in this case: 1) the defendant's mental health history; 2) his lack of substance abuse; and 3) his community involvement."  Mr. Pilling's mental health history is addressed above in connection with the suggested departure under § 5H.1.3.  His non-consumption of alcohol or controlled substances, and his record of honorably serving in the United States Air Force, and building a striking record of community service are discussed in detail in section 2, pp. 2-7 of this Memorandum, above.

    A probationary sentence will provide appropriate deterrence, §3553(a)(2)(B).  Mr. Pilling's and his family's lives have been turned upside down by this prosecution.  The community is well aware of these proceedings, of the zeal with which the government has pursued the case, and of the toll it has taken on the Pilling family.  Nor is there a "need … to protect the public from further crimes of the defendant," § 3553(a)(2)(C).  Mr. Pilling is a first offender who has led an exemplary life.  The public does not need protection from him – it needs him to be present in the community to continue his life of family, work and service.

DEFENDANT'S SENTENCING MEMORANDUM - 20

DATED this 7th day of August, 2024.

NEVIN, BENJAMIN & McKAY LLP

/s/ David Z. Nevin
David Z. Nevin

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Cassandra Barnum
Cassandra.barnum@usdoj.gov

Frank Zabari
Frank.zebari@usdoj.gov

/s/ David Z. Nevin
David Z. Nevin