JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
FRANCIS J. ZEBARI, IDAHO STATE BAR NO. 8950
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788.
TELEPHONE: (208) 334-1211

TODD KIM
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT AND NATURAL RESOURCES DIVISION
CASSANDRA BARNUM, MASSACHUSETTS STATE BAR NO. 678750
SENIOR TRIAL ATTORNEY, ENVIRONMENTAL CRIMES SECTION
150 M ST. NE
WASHINGTON, DC 20002
TELEPHONE: (202) 305-0333

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BREK PILLING,<br><br>Defendant. | Case No. 4:22-cr-00282-BLW<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

The United States of America, by and through Joshua D. Hurwit, United States Attorney for the District of Idaho, and Todd Kim, Assistant Attorney General, Environment and Natural Resources Division, submits the following memorandum setting forth the Government's position at sentencing.

**GOVERNMENT'S SENTENCING MEMORANDUM - 1**

# INTRODUCTION

The Defendant, Brek Pilling, pled guilty to negligent endangerment under the Clean Air Act based on the release of airborne asbestos fibers from a demolition project in Burley, Idaho. For his actions in this case, the Government recommends that the Defendant be sentenced to 12 months of incarceration, which is the statutory maximum for this misdemeanor. The maximum is warranted here, where the advisory sentencing guideline range is 41-51 months and there was a substantial danger to public health.

# PROCEDURAL BACKGROUND

The Defendant was indicted in December 2022 on seven counts of violating the Clean Air Act. The case was set for trial in March 2024. Shortly before trial, the Government and the Defendant entered into a plea agreement in which the Defendant agreed to plead guilty to one count of Negligent Endangerment under 42 U.S.C. § 7413(c)(4). The Defendant entered his plea on March 4, 2024.

# FACTS

The facts of the case are contested. The Government argues that the exhibits included here demonstrate by a preponderance of the evidence that the following facts are true. *See United States v. Francisco Lucas, Jr.*, 101 F.4th 1158, 1162-63 (9th Cir. 2024) (*en banc*) (Ninth Circuit joined all other circuits in holding that clear and convincing evidence is *not* required for factual findings under the advisory Sentencing Guidelines, even when potentially large and disproportionate enhancements are at stake, and that "fact-finding by a preponderance of the evidence is sufficient to satisfy due process at sentencing").

I.      **Purchase and Demolition of Overland Avenue Buildings**

The two buildings at 1222 and 1226 Overland Avenue, in Burley, Idaho ("the Overland buildings") caught fire in January 2018, and were demolished in February 2018. The buildings contained asbestos, which was not properly remediated prior to the demolition. The demolition resulted in the release of asbestos fibers to the ambient air. *See* Exh. 1 (asbestos sampling results).

The Overland buildings were purchased in October 2017 by Diconia, LLC ("Diconia"). PSR ¶ 8. The parties contest whether the Defendant had a direct ownership interest in Diconia and therefore in the buildings. Regardless, by his own admission, the Defendant and Tibbets intended at the time of purchase to tear down the buildings and erect a parking lot that would serve their restaurant across the street. *Id.*; *see also* Exh. 2 (informal transcription of Defendant's statements during video-recorded interview with ATF agents).[1]

After the fire, the Defendant solicited bids from several contractors for the demolition. These bids ranged in price from approximately $42,000 to $63,000. *See* Exhs. 3-5 (bids). Two of these contractors expressed to the Defendant that there was likely asbestos in the buildings and that they would not be able to conduct the demolition without testing and abatement. Specifically, Cord Thorpe told the Defendant that the buildings likely had asbestos and that there was a 10-day notification requirement to EPA. Owen Watterson told the Defendant that he could not do projects involving asbestos. *See* PSR ¶ 9; Exhs. 6 (interview report of Cord Thorpe), 7

---

[1] The Government will have the interview available for the court's review at the sentencing hearing. The Defendant has argued that he learned subsequent to these statements that he did not have an ownership stake in the buildings because they were purchased by a different Diconia LLC based in Nevada. Doc. 97 at 2. The Government contests this allegation, based on the Defendant's signing of a check from a Diconia LLC with an Idaho address to Curb A Peal, dated February 26, 2018 (Exh. 11). Regardless, the statements are relevant to show that the Defendant did have an interest in the outcome of the project, and to show that even prior to the fire, it was the Defendant's intention to hire Evan Carnahan to conduct the demolition.

**GOVERNMENT'S SENTENCING MEMORANDUM - 3**

(interview report of Owen Watterson). A third contractor, Brian Moeller, on the assumption that he had the job, conducted a walkthrough of the site and found suspected asbestos-containing materials. He contacted an asbestos inspector to come inspect the buildings. When he told the Defendant this, however, the Defendant called him off, saying that he was going to have other inspectors come conduct the testing (he did not). *See* PSR ¶ 10; Exhs. 8 (interview report of Brian Moeller), 9 (email to Brian Moeller). Based on these conversations, the Defendant should have known of the presence of asbestos in the Overland buildings. *See* Exh. 10 (text message from Defendant to Tibbets).[2]

Instead of hiring asbestos inspectors and abatement contractors, however, the Defendant and Tibbets hired Evan Carnahan. *See* Exhs. 11 ($20,000 check from Diconia LLC to Curb A Peal, dated February 26, 2018, with Defendant's signature), 12 (Defendant's bank account application with signature for comparison purposes).[3] Carnahan was the co-owner with the Defendant of contracting firm Curb A Peal. *See* Exhs. 12 (bank account application for Curb A Peal listing Defendant as "Key Executive with Control of the Entity"), 13 ("Curb A Peal Resume" demonstrating Defendant ownership interest); 16 (email in which Defendant states he is a partial owner of Curb A Peal).[4] Carnahan demolished the buildings on February 17-18, 2018,

---

[2] The Defendant says he relied on sampling conducted by Tibbets. Doc. 97 at 3. That sampling occurred *after* the demolition, and furthermore consisted of pieces of wood, brick, and metal – materials that would never contain asbestos. *See* Exh. 17 (Tibbets sampling results). And it bears emphasizing that the Defendant actively prevented an asbestos inspector from conducting a real asbestos survey at the facility before the buildings were torn down. *See* PSR ¶ 10; Exhs. 8-9.

[3] The Defendant denies that he hired Carnahan, Doc. 97 at 3, but does not address the fact that he signed a check from Diconia to Curb A Peal.

[4] Again, the Defendant denies ever having owned Curb A Peal, Doc. 97 at 3, without addressing this evidence to the contrary. The Government would also have put on evidence at trial to the effect that the Defendant purchased the heavy machinery Carnahan used in the demolition, further demonstrating the Defendant's financial investment in Curb A Peal.

**GOVERNMENT'S SENTENCING MEMORANDUM - 4**

without conducting asbestos abatement, as pictured below. *See* Exh. 14 (interview report of Carnahan).





**GOVERNMENT'S SENTENCING MEMORANDUM - 5**

Carnahan had some of the demolition waste trucked to a local gravel pit that was not authorized to accept asbestos waste. To do so, and with the Defendant's consent, he used trucks owned by another one of the Defendant's businesses.

While proper remediation of the site was pending, Diconia allowed the rubble at the site to dry out—making it subject to movement by wind—and did not properly control access to the site. Finding that the site was not being properly managed, EPA determined that an emergency clean-up was necessary to protect the public health. *See* Exh. 15 (EPA Action Memorandum). The expense of that clean-up was nearly $845,000.

## II. Health Impacts of Asbestos

Asbestos is the general name for a group of six types of naturally occurring minerals, which consist of thin fibers grouped in parallel arrangements or bundles. Asbestos does not have an odor or taste, and is resistant to heat, fire, most chemicals, and biological processes. Agency for Toxic Substances and Disease Registry Division of Toxicology ("ATSDR"), *Public Health Statement Asbestos* at 1 (2001). When crushed, asbestos breaks up in to fine, microscopic fibers that may remain airborne for long periods of time. *Id.* at 2.

Asbestos is a "listed" hazardous substance and hazardous air pollutant. *See* 42 U.S.C. § 7412(b)(1) and 40 C.F.R. § 302.4. Congress has found that medical science has established no minimum safe level of exposure to asbestos. 20 U.S.C. § 3601(a)(3). Similarly, The World Health Organization has concluded that "[a]sbestos is a proven human carcinogen. No safe level can be proposed for asbestos because a threshold is not known to exist." World Health Organization Regional Office for Europe, *Air Quality Guidelines for Europe* 133 (2d ed. 2000). The EPA and the International Agency for Research on Cancer have also determined that asbestos is a human carcinogen. ATSDR, *Public Health Statement Asbestos* at 5.

Asbestos can cause changes to the membranes surrounding the lung and has the potential to cause a number of diseases of the lungs, including asbestosis, lung cancer, and mesothelioma, a cancer of the membrane around the lungs. The likelihood of developing these health effects depends, among other things, on the level of asbestos in the air, the duration of exposure, and the size of the fibers inhaled. *Id*. at 4.

Asbestosis is a slow buildup of scar-like tissue in the lungs and in the membrane that surrounds the lungs. The scarred tissue loses its flexibility, which makes breathing difficult. The scarring may also reduce blood flow to the lungs which, in turn, can cause enlargement of the heart. The outward symptoms of asbestosis include shortness of breath, cough, abnormal breathing sounds, and decreased lung capacity. Asbestosis can eventually lead to disability and, in severe cases, death. *Id*.; ATSDR, *Toxicological Profile for Asbestos* at 39. Asbestosis can take ten to twenty years to develop and may progress "long after exposure has ceased." ATSDR, *Toxicological Profile for Asbestos* at 41.

Mesothelioma is a form of cancer that affects the membrane surrounding the lungs. It is rare in the general population and is associated specifically with asbestos exposures. *Id*. at 51. Cases of mesothelioma have been reported in individuals who have been occupationally exposed to asbestos, in individuals whose exposure was paraoccupational, and in individuals who were exposed environmentally. *Id*. at 52-53.

According to the ATSDR, statistically significant increases in lung cancer mortality have been reported in workers exposed primarily to chrysotile. The latency period for asbestos-induced lung cancer is ten to forty years. *Id*. at 49. There is an even greater increase in lung cancer risk from asbestos exposure in people who smoke. *Id*.

## LEGAL ANALYSIS

The Ninth Circuit has set forth a basic framework that district courts should follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

(1) Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.

(2) Courts should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. The guidelines are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

(3) If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

(4) Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008).

## SENTENCING CALCULATION

### I. Statutory Maximum and Minimum Sentence

A violation of 42 U.S.C. § 7413(c)(4) is punishable by up to 1 year in prison, a term of supervised release of up to 1 year, a maximum fine of $100,000, and a special assessment of $25.

### II. United States Sentencing Guidelines Calculation

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

A.     **Offense Level Calculation**

1.     PSR Calculation

Probation calculated the offense level in this case to be 23. Initial PSR ¶ 14. The Government agrees with Probation's application of the sentencing enhancements at U.S.S.G. § 2Q1.2(b)(1)(A), (b)(2), and (b)(3), and provided briefing in support of the latter in its response to the Defendant's PSR objections. *See* Doc. 96. The Government has agreed not to oppose subtracting an additional point for acceptance of responsibility, such that the total offense level would be 22, corresponding to an advisory guidelines range of 41-51 months.

2.     Applicable Enhancements

a.     U.S.S.G. § 2Q1.2(b)(1)(A) – Ongoing or Continuous Release

The Government concurs with the PSR that the above enhancement applies in this case, and the Defendant has not objected to its application.

b.     U.S.S.G. § 2Q1.2(b)(2) – Substantial Likelihood of Death or Serious Bodily Injury

The Guidelines provide for a 9-level enhancement if an offense "resulted in a substantial likelihood of death or serious bodily injury." The Defendant has already acknowledged in his guilty plea that the release of asbestos fibers at issue in this case created an imminent danger of serious bodily injury. What remains contested is whether there is a "substantial likelihood" of such injury.

The Guidelines do not define "substantial likelihood," but other courts have discussed the meaning of "substantial likelihood" in the context of asbestos-related diseases. The Ninth Circuit has found that the defendant's violation of an asbestos work practice standard itself triggered the

application of § 2Q1.2. *See United States v. Pearson*, 274 F.3d 1225, 1235 (9th Cir. 2001). While here the Defendant has not been convicted of violating a work practice standard, he has pled guilty to conduct with the same practical effect: the release of airborne asbestos fibers. In *Pearson*, the district court did not hold an evidentiary hearing, but applied the nine-level enhancement "based on its finding that Pearson violated, and instructed others to violate, the work practice standards [for asbestos], resulting in conditions where asbestos was not stored, or removed properly," and the fact that "it is generally accepted that exposure to asbestos can cause mesothelioma, asbestosis, lung cancer; and cancers of the esophagus, stomach, colon, and rectum." *Id*. (*citing* Occupational Safety and Health Administration ("OSHA") Fact Sheet: Better Protection Against Asbestos in the Workplace (January 1, 1993)). The Ninth Circuit found that "Pearson's noncompliance with the work practice standards created a substantial likelihood that workers would be exposed to life-threatening asbestos fibers," and that the nine-level enhancement was therefore properly applied. *Id.*; s*ee also United States v. Yi*, 704 F.3d 800, 806 (9th Cir. 2013) (upholding application of nine-level enhancement based on worker exposure to asbestos and holding that there is no requirement that the government present an expert to establish a foundation for the enhancement); *United States v. Fillers*, No. 1:9-CR-144, 2012 WL 5364841 (E.D. Tenn. Oct. 29, 2012), *aff'd sub nom. United States v. Mathis*, 738 F.3d 719 (6th Cir. 2013) (applying 2Q1.2(b)(2) enhancement in asbestos case on the basis that it was "considerably more likely" that exposed workers would develop serious diseases than it would have been without defendant's conduct).[5] In the present case, the same logic applies. The

---

[5] While not in an asbestos case, the Tenth Circuit used a similar *per se* application of the enhancement under § 2Q1.2(b)(2) where "the district court found by a preponderance of the evidence that the defendant had 'created a risk of serious injury to others, [including] employees, innocent neighbors, firefighters and other rescue workers' because of the possibility of a fire or explosion, and that 'the risk was substantial, not from the way in which the materials were handled, but *due simply to the fact that large quantities of ignitable hazardous wastes were*

**GOVERNMENT'S SENTENCING MEMORANDUM - 10**

Defendant's conduct resulted in the release of asbestos fibers to which the surrounding community was exposed for months.

The Defendant has argued against the application of this enhancement on the basis that the release in this case created less of a health risk that those in the cases cited above. *See* Doc. 97 at 10. But the Guidelines account for this type of distinction. The application notes explain that "[s]ubsection (b)(2) applies to offenses where the public health is seriously endangered. Depending upon the nature of the risk created and the number of people placed at risk, a departure of up to three levels upward or downward may be warranted." U.S.S.G. § 2Q1.2, cmt. n.6. To the extent the Court finds that the facts of this case created a lower risk than the facts of other cases in which the 9-level enhancement applies, it has the discretion to depart downward in recognition thereof.

          c.      2Q1.2(b)(3) – Substantial Expenditure for Clean-Up

The Government has previously argued that the expenditure of nearly $845,000 in this case constitutes a substantial expenditure warranting the application of the above enhancement and incorporates those arguments by reference here. *See* Doc. 96.

    **B.**    **Criminal History Calculation**

Probation calculated the defendant's criminal history to be Category I. PSR ¶ 37. The Government agrees. The Government also agrees that the Defendant is entitled to a 2-level reduction as a Zero-Point Offender under U.S.S.G. § 4C1.1.

---

*sitting on [Dillon]'s properties*.'" *United States v. Dillon*, 351 F.3d 1315, 1317 (10th Cir. 2003) (emphasis added). In light of the Tenth Circuit's application of the enhancement provided under U.S.S.G. § 2Q1.2(b)(2) to the simple storage of ignitable substances, it is reasonable to apply the enhancement in this case – where workers and community members were actually exposed to a substance known to cause serious harm to human health.

### C. Advisory Guidelines Range

Based on the foregoing, the total offense level should be 22, yielding an advisory Guidelines range of 41-51 months. The Government recommends that the Defendant be sentenced to the statutory maximum of 12 months of incarceration.

## IMPOSITION OF SENTENCE

### I. Imposition of a Sentence Under 18 U.S.C. § 3553

#### A. 18 U.S.C. § 3553(a) Factors

Congress has instructed courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the serious of the offense, to promote respect for the law, and to provide just punishment, the need for the sentence imposed to afford adequate deterrence and to protect the public, and the need to avoid unwarranted sentencing disparities, among other factors. *See* 18 U.S.C. § 3553(a).

In this case, the serious nature of the offense and the circumstances of the harm potentially visited upon the community warrant a custodial sentence for the Defendant. He actively prevented an asbestos inspection from taking place at the site that would have confirmed the presence of asbestos and set proper abatement in motion. In doing so, the Defendant failed in his legal and ethical obligation to protect community members from toxic airborne asbestos fibers. The Defendant's crimes are not mere technical regulatory violations; by calling off a qualified asbestos inspector and allowing an untrained contractor to conduct demolition without asbestos precautions, the Defendant endangered the surrounding community. This is a serious offense that warrants incarceration.

A period of incarceration is also necessary to ensure the Defendant will respect the law, thereby deterring future misconduct. It would further create general deterrence, sending a

message to other construction professionals in this District and elsewhere that failure to remediate asbestos is a serious offense with serious consequences. Punishment for breaking environmental laws must not be seen as a mere cost of doing business.

With respect to unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6), the Government acknowledges that sentences of incarceration have not been a common outcome in negligent endangerment cases. The Government would draw the Court's attention to a recent asbestos case in which two co-defendants each received 6-month sentences for negligent endangerment, for the proposition that incarceration is an appropriate and precedented outcome in cases like this one. *See United States v. Morales, et al*, No. 2:21-cr-00199 (D. Nev. 2023).

More broadly, though, the Government emphasizes that avoiding unwarranted sentencing disparities based on national sentencing data is a complex endeavor, due to each court's inability to fully know the circumstances of sentences in other cases. Any one sentencing court cannot know every other court's record of PSRs, cooperation information, or procedural history, and cannot have a nuanced understanding of other individual defendants. Unlike cases involving co-defendants – where avoiding unwarranted sentencing disparities as between those co-defendants would be a relatively simple endeavor for the court – determining whether a sentence constitutes an "unwarranted" disparity based on national sentencing data is a difficult task.

Indeed, cases involving uncommon charges, like that at issue here, often involve undue and disproportionate attention and weight to this sentencing factor due to the ability to document and analyze the full universe of such cases. This trend, pervasive in the field of environmental crimes, undermines the Sentencing Guidelines, the sentencing statute, and the statute constituting the violation. Congress determined, in passing the Clean Air Act, that negligent endangerment can appropriately result in a sentence of incarceration for up to one year. Similarly, the United

States Sentencing Commission determined that cases involving hazardous substances should result in sentences of incarceration when the enhancements argued for here apply.[6] And Section 3553(a) contemplates a balancing of all the listed factors, without giving dispositive weight to any particular one. That the Court may note a trend of below-Guidelines sentences in its consideration of this factor does not require a similar outcome in this case.

The Supreme Court has acknowledged that, while "Section 3553(a)(6) requires judges to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" the Sentencing Commission already considered "avoidance of unwarranted disparities . . . when setting the Guidelines ranges." *Gall*, 552 U.S. at 54. As such, a judge who "correctly calculate[s] and carefully review[s] the Guidelines range necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Id.; see also United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is to eliminate disparities among sentences nationwide.") (internal quotation marks and citations omitted); *United States v. Bartlett*, 567 F.3d 901, 907–08 (7th Cir. 2009) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.").

Even if the Court determines that the need to avoid unwarranted sentencing disparities supports a below-Guidelines sentence, the Court should not weigh this sentencing factor more heavily than the other Section 3553(a) factors discussed above, which weigh in favor of a

---

[6] Indeed, the Guidelines are the sole means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the 3553(a) factors, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. Therefore, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

sentence of incarceration.[7] Such undue weight has presumably contributed to the remarkably high percentage of below-Guidelines sentences in Clean Air Act cases to date. But if each court varies downward to be consistent with the pattern of prior cases, then this sentencing factor becomes a nationwide downward ratchet that defeats the purpose of a multi-factor sentencing analysis, undermines the Sentencing Guidelines, and vitiates the deterrent effect of criminal enforcement.

> B. **Application of the Guidelines in Imposing a Sentence under 18 U.S.C. § 3553(b).**

The Government's recommendation is based in part on the fact that a sentence in keeping with the Guidelines properly reflects the accumulated wisdom and expertise of the Sentencing Commission and serves the vital goal of uniformity and fairness in sentencing. The Guidelines, formerly mandatory, now serve as one factor among several that courts must consider in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). It remains, however, that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 108-09 (internal quotation marks omitted). Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The Guidelines deserve significant respect. The Government recognizes that the Guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. A district court, however,

---

[7] *See Gall*, 552 U.S. at 51 (in justifying a downward variance based on the § 3553(a) factors, those factors "must, *on a whole*, justify the extent of the variance") (emphasis added).

**GOVERNMENT'S SENTENCING MEMORANDUM - 15**

must consider the Guidelines range, *see* § 3553(a)(4), and is usually well-advised to follow the Sentencing Commission's advice in order to assure fair, proportionate, and uniform sentencing of criminal offenders. Accordingly, the Government recommends a sentence of 12 months, the maximum allowable by law but still substantially lower than the advisory Guidelines range.

## **CONCLUSION**

Application of 18 U.S.C. § 3553 supports a sentence of 12 months of incarceration for the Defendant's violation of the Clean Air Act. The Government submits that a sentence of 12 months is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Respectfully submitted this 7th day of August, 2024.

JOSHUA D. HURWIT
United States Attorney
By:


*/s/ Francis J. Zebari*
Francis J. Zebari
Assistant United States Attorney

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
By:


*/s/ Cassandra Barnum*
Cassandra Barnum
Senior Trial Attorney

**GOVERNMENT'S SENTENCING MEMORANDUM - 16**